UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

                                        Case No.14-cr-20030
                                        HON. GERSHWIN A. DRAIN

vs.


D-2    ALEXIS WARREN,

        Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS
EVIDENCE [#29]**

## I.    INTRODUCTION

Presently before the Court is the Defendant, Alexis Warren's, Motion to Suppress Evidence, filed on June 10, 2014. The matter is fully briefed and oral argument was held on August 7, 2014. At the hearing on August 7, 2014, the parties stipulated to rely on the testimony from Warren's and her Co-Defendant, James Blakley's, detention hearings, and the two DVD videos of the traffic stop at issue herein. Upon consideration of the parties briefing, their oral arguments, the transcripts from the detention hearings, the two DVD videos of the traffic stop, and the applicable precedent, the Court is compelled to conclude that there was an absence of reasonable suspicion to extend the scope and duration of the stop beyond its original purpose. As such, the prolonged detention and resulting search were unlawful under the Fourth Amendment. The Court will grant Warren's Motion to Suppress Evidence.

## II.    FACTUAL BACKGROUND

On April 1, 2014, Warren was charged in a First Superseding Indictment with conspiring to possess with intent to distribute heroin in violation of 21 U.S.C. §§ 841(a) and 846 (Count I), and with possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a) (Count II).   On November 25, 2013, Michigan State Police ("MSP") Trooper Craig Ziecina, assigned to road patrol at the Jackson post, was working in the area of westbound I-94 and Race Road in Jackson County, Michigan.   Ziecina observed a minivan pass his location traveling in the left lane of the two-lane freeway.   After the minivan passed his police vehicle, it continued to travel in the left lane.   Ziecina initiated a traffic stop for improper lane use in violation of Michigan Compiled Laws § 257.634(2).

Warren was the driver of the minivan and Blakley was the passenger.   Ziecina and two other officers approached the minivan on the passenger side of the vehicle.   Ziecina testified at Blakley's detention hearing that Warren gave him the paperwork for the vehicle, her license, and Blakley provided his identification as well. Blakley informed Ziecina that the vehicle had been rented by his wife, Warren was his niece and they were traveling back to Chicago from Detroit.   Ziecina's questioning took about two and a half minutes and he and the other officers returned to the patrol car.

Ziecina also testified that he returned to the minivan nine minutes[1] into the stop to ask questions related to the renter of the vehicle because her last name was different than Blakley's last name.   He also noticed that the rental agreement provided for a return date that was ten days prior to November 25, 2013, and wanted information related to the past due nature of the rental agreement.   However, he did not testify that he was suspicious that the minivan had been stolen. He asked Warren to get out of the minivan and sit in the front passenger seat of his patrol vehicle.

_____

[1]  The Court's factual determinations concerning timing are reflected in the video of the stop.  *See* Gov.'s Ex. B.

-2-

Once inside the patrol car, he began questioning Warren about her relationship to Blakley.  She confirmed that the renter of the vehicle was Blakley's wife, however she could not recall her last name, stating that "it sounds funny."[2]  She also informed Ziecina that she believed Blakley was officially married, but she was not certain.  She knew they had been together for fourteen years. When Ziecina asked Warren the purpose of the trip, she advised him that she had been in Detroit for roughly twenty-four (24) hours,  had purchased several Christmas gifts for a friend's children and she and Blakley spent the night at her friend's house.  Ziecina asked Warren if she was responsible for everything inside the vehicle and she replied in the affirmative.  Ziecina asked if illegal drugs were in the minivan and Warren denied that narcotics were in the vehicle. Ziecina inquired about the past due nature of the rental agreement and she explained that the rental agreement's return date had been extended by credit card over the phone.  Ziecina's questioning of Warren took seven and a half minutes.

Ziecina returned to the minivan to question Blakley.  During this time period, Warren exited the patrol car and tried to return to the minivan.  Ziecina ordered her to get back in the patrol car and told her that she was not free to leave.  Ziecina maintains that upon questioning Blakley concerning Warren's identity, the renter of the vehicle's name and how long Blakley had been in Detroit, Blakley provided extremely inconsistent answers.  Ziecina asked Blakley if narcotics were in the minivan and Blakley responded in the negative.  Blakley  would not consent to a search of the vehicle. Ziecina's questioning took roughly another six and a half minutes.

_____

[2]  The renter's legal name is Tali Benzaquen. She testified at Blakley's detention hearing and indicated that she had in fact given Warren permission to drive the rental vehicle during her and Blakley's trip to Detroit.   Additionally, the Court rejects Ziecina's testimony that Warren could not recall Blakley's first name, the video from the stop shows that his testimony is inaccurate.

-3-

Ziecina thereafter returned to his patrol car and sought Warren's permission to search the vehicle. By this time, twenty three minutes had gone by. He informed Warren that he was calling for a canine unit, which arrived roughly four and a half minutes later. Once on the scene, the dog alerted and a search of the interior of the vehicle was conducted. A vacuum-sealed plastic bag was found in the sleeve of a large (size 6X) black leather coat located in the middle seat behind the front passenger seat. The bag contained over 900 grams of heroin. Thirty minutes after the initial stop for improper lane use, Warren and Blakley were placed under arrest. Ziecina never issued a traffic citation for improper lane use.

Warren argues that the stop was unconstitutional because she was not violating Michigan law when Ziecina initiated the stop. She maintains that Ziecina's mistaken belief about the law cannot provide reasonable suspicion for a traffic stop. She further argues that Ziecina's stop was unreasonable because it was longer than necessary for a routine traffic stop. Conversely, the Government argues that Warren lacks standing to challenge the search, the traffic stop was lawful and the length of the stop was reasonable under the circumstances.

## III.    LAW & ANALYSIS

### A.    Standing

The Government first argues that Warren lacks standing to challenge the search because she was an unauthorized driver of a rented automobile. While courts do not refer to the issue as that of standing to challenge the search, Warren must nonetheless demonstrate she had a reasonable expectation of privacy in light of the surrounding circumstances. *United States v. Smith*, 263 F.3d 571, 581-82 (6th Cir. 2001). The *Smith* court acknowledged that generally "an unauthorized driver of a rental vehicle does not have a legitimate expectation of privacy in the vehicle . . . ." *Id.* at 586.

-4-

However, the *Smith* court declined to use a bright-line test based on whether a defendant is a listed driver on the rental agreement. *Id.*

In *Smith*, the defendant challenged the search of a rental vehicle he was driving on the Tennessee interstate after he was stopped for speeding in the early morning hours of May 13, 1999. *Id.* at 575. In concluding the defendant had standing to challenge the search of the rental vehicle, the *Smith* court relied on the fact the defendant was a licensed driver and was given permission to drive the vehicle by his wife, the renter of the vehicle. *Id.* at 586-87. Moreover, the *Smith* defendant had a business relationship with the rental company because he was the individual who originally arranged to rent the car, even though his wife actually signed the rental agreement. *Id.* The *Smith* court specifically noted that "[a]lthough Smith's use of the vehicle was clearly a breach of the agreement with [the car rental company], it does not follow that he has no standing to challenge the search." *Id.* at 587. "[I]t was not illegal for Smith to posses or drive the vehicle, it was simply a breach of the contract with the rental company." *Id.*

Here, Warren had a reasonable expectation of privacy in the rental car under the totality of the circumstances. She and Blakley participated in borrowing the car from his wife, who gave Warren permission to drive the car during the trip to Detroit. Moreover, she had a valid driver's license, provided a copy of the rental agreement to Ziecina, and claimed possessory interest in everything in the vehicle. That the vehicle was past its return date and did not list her as a driver is not dispositive, just as in *Smith*, these facts merely demonstrate "a breach of the contract with the rental company[,]" as it is was legal for Warren to possess and drive the vehicle. Therefore, based on the totality of the circumstances, the Court concludes that Warren has standing to challenge the search.

**B.    Probable Cause Existed for the Traffic Stop**

-5-

The Fourth Amendment protects "[t]he right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures . . . ."  U.S. CONST. amend IV. A police officer may lawfully stop a car when he has probable cause to believe that a traffic violation has occurred.  *United States v. Torres-Ramos*, 536 F.3d 542, 550 (6th Cir. 2008).  "'When a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant.'"  *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)(citing *Whren v. United States*, 517 U.S. 806, 813 (1996)).

Warren argues that probable cause did not support the traffic stop because she was not engaged in improper lane use and was in full compliance with the law.  Thus, Ziecina's mistake concerning improper lane use cannot provide probable cause for the stop.  *See United States v. Miller*, 146 F.3d 274, 279 (5th Cir. 1998); *United States v. McDonald*, 453 F.3d 958, 961 (7th Cir. 2006); *United States v. Nicholson*, 721 F.3d 1236, 1242 (10th Cir. 2013).  The applicable statutory provision states:

> Upon a roadway having 2 or more lanes for travel in 1 direction, the driver of a vehicle shall drive in the extreme right-hand lane available for travel except as otherwise provided in this section.  However, the driver of a vehicle may drive in any lane lawfully available to traffic moving in the same direction of travel when the lanes are occupied by vehicles moving in substantially continuous lanes of traffic and in any left-hand lane lawfully available to traffic in the same direction of travel for a reasonable distance before making a left turn.

MICH. COMP. LAWS § 257.634(2).

A review of the video from the stop shows that at the time Defendant was traveling in the left lane, both lanes of the highway were not "occupied by vehicles moving in substantially continuous lanes of traffic . . . ."  *Id.*  As such, she was required to return to the right lane and was driving in violation of Michigan law.  Therefore, Ziecina had probable cause to initiate the stop.

**C.      Scope and Duration of the Detention**

-6-

While an officer may stop a vehicle if he has probable cause to believe a civil infraction has occurred, "once the purpose of the traffic stop is completed, a police officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify further detention." *Torres-Ramos*, 536 F.3d at 550. (internal quotations omitted); *see also United States v. Everett*, 601 F.3d 484, 488 (6th Cir. 2010)(quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005))("Of course, 'a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.'" ).

Reasonable suspicion requires specific and articulable facts that would warrant a man of reasonable caution in the belief that the action taken was appropriate." *Blair*, 524 F.3d at 750. "[A]n inchoate and unparticularized suspicion or hunch of criminal activity" does not amount to reasonable suspicion. *Id.* (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)). To assess whether the officer had reasonable suspicion that criminal activity was afoot, the Court must "define the proper scope and duration of the initial traffic stop." *Torres-Ramos*, 536 F.3d at 550. In other words, "at what point in time did the purpose of the traffic stop end and the detention of the driver and the van's occupants [] begin?" *Id.* The answer to this question determines "*which* facts should be considered in the reasonable suspicion inquiry." *Id.* (emphasis in original).

The detention under review must be "'limited in [both] scope and duration.'" *Everett,* 601 F.3d at 488 (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Police officers must use "the least intrusive means reasonably available to verify or dispel [their] suspicion in a short period of time[;]" the detention "must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Royer,* 460 U.S. at 500. Courts must determine "whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the

reasonableness of the officials' conduct given their suspicions and the surrounding circumstances." *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012).

"[T]he overarching consideration is the officer's diligence–i.e., his 'persevering' or 'devoted . . . application to accomplish [the] undertaking' of ascertaining whether the suspected traffic violation occurred, and, if necessary issuing a ticket." *Everett*, 601 F.3d at 494. An officer is not required to "move at top speed," however if, under the totality of the circumstances, it is determined that the officer "abandoned the prosecution of the traffic stop and embarked on another sustained course of investigation," such conduct could not be construed as diligent for purposes of the reasonableness inquiry. *Id.* Where a detention is found to exceed its proper investigative scope, any items seized from a resulting unlawful search must be excluded as fruits of the poisonous tree. *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484 (1963)).

Generally, "[r]equesting a driver's license, registration, rental papers, running a computer check thereon, and issuing a citation are permissible police acts within the scope of the traffic stop." *United States v. Bonilla*, 357 F. App'x 693, 696 (6th Cir. 2009) (citing *Hill*, 195 F.3d at 269.). As such, Ziecina's initial questions and request for identification were reasonable for the purpose of the initial stop. When Ziecina returned to the minivan after his initial questioning and investigation in the patrol car, he had sufficient information to issue a traffic citation for improper lane use. There is no evidence in the record suggesting he would have had reasonable suspicion that criminal activity was afoot. He did not testify to finding anything suspicious about their licenses or answers to his questions at this point during the stop. There is no indicia of criminal activity like in other cases where the Sixth Circuit has found that the search was based on reasonable suspicion such as nervous behavior, location in a high crime area, extremely late hour, or an extensive criminal history

-8-

record upon the license check. *See Bonilla,* 357 F. App'x at 699-700 (concluding the case "lacked any strong indicators of criminal conduct," thus the purpose of the original stop had been unreasonably extended.)  While "in evaluating reasonable suspicion, one determination will seldom be a useful precedent for another," the way in which the courts have analyzed certain factual circumstances can be instructive. *Torres-Ramos,* 536 F.3d at 553 (internal quotation marks omitted).


Similar to the situation in *Torres-Ramos,* the purpose of the stop ended when Ziecina put Warren in the patrol car.  In *Torres-Ramos,* the officer stopped a car for speeding. *Id.* at 546. Upon his initial encounter with the occupants in the car, he questioned the driver who could not remember the owner of the vehicle's last name, acted nervously and could not provide an explanation as to how she came in possession of the vehicle.  *Id.* at 553.   The officer then ordered the driver to sit in his patrol car and proceeded to question the passenger in the car.  *Id.* at 546-47.  The *Torres-Ramos* court concluded that the purpose of the traffic stop was completed at this time and the officer was required to have reasonable suspicion that the van was not lawfully possessed. *Id.* at 551.

"Issuing a speeding ticket does not require an officer to detain an individual in order to separately question a passenger regarding ownership or travel plans." *Id.*   As such, "[u]nless [the officer] had reasonable suspicion that criminal activity was afoot at this point in time, the detention violated both [occupants'] Fourth Amendment rights." *Id.*   Ultimately, the *Torres-Ramos* court concluded that there was reasonable suspicion to extend the scope and duration of the stop because he had reasonable suspicion that the car was unlawfully possessed based on the driver's nervousness,  inability to explain how she came to possess the vehicle, which was stopped more than a thousand miles from the owner's residence.  *Id.*

-9-

Here, Ziecina did not need to separate and detain Warren in order to complete issuing the civil infraction ticket. Ziecina's decision to separate the car's occupants and detain Warren show a lack of reasonable diligence in pursuing the purpose of the traffic stop for improper lane use. At the time he decided to separate them, Ziecina should have had sufficient information to issue the ticket. Separating the occupants to determine any purported suspicions concerning the renter and her relationship to the occupants was not the least intrusive means reasonably available to Ziecina.

In *Blair*, the Sixth Circuit reversed the district court's denial of the defendant's motion to suppress evidence stemming from a traffic stop in Tennessee. *Id*. at 743. In *Blair*, two officers were conducting surveillance of a residence suspected of being a drug house. 524 F.3d at 745. One of the officers observed the defendant stop at the residence and speak to the owner. *Id*. The officer also believed that he witnessed a hand-to-hand drug transaction and radioed to another officer, who later pulled the defendant over for a tag-light violation. *Id*. However, there was a discrepancy in the record as to whether this officer in fact learned of the possible drug transaction at that time, or if he learned of it after the license check had come back valid. *Id*. The *Blair* court concluded that the district court improperly found that the officer knew the defendant had just left the suspected drug house and possibly engaged in a hand-to-hand drug transaction. *Id*. at 753.

The officer claimed he had reasonable suspicion of narcotics activity because he noticed that the defendant appeared "a little fidgety" and was reaching underneath the seats of the vehicle. *Id*. The officer informed the defendant that the area was known for drug trafficking and requested permission to search the vehicle. The defendant refused and the officer informed him that he believed there were narcotics in the car and he was going to call for a canine unit. *Id*. at 746. The *Blair* court concluded that the officer did not have reasonable suspicion of drug activity based on the fact that the defendant was fidgety, reached underneath the seats and was traveling at night in

-10-

a known drug area. *Id.* At the point the officer called for the canine unit, he had sufficient information to issue the ticket for the tag light violation, thus the purpose of the stop had been completed. *Id.* at 752. Without reasonable suspicion, the officer did not have the authority to extend the scope and duration of the stop by calling for the canine unit. *Id.* at 753.

In *Bonilla*, the driver-defendant was pulled over for following the car in front of it too closely. *Bonilla*, 357 F. App'x at 694. The *Bonilla* court ultimately concluded the nearly twenty-five minute stop was unreasonable under the circumstances. *Id.* at 699-700. The *Bonilla* court rejected the Government's argument that the driver's nervousness, the Cleveland, Ohio destination, discrepancies in travel plans and that the driver could not remember his passenger's last name amounted to reasonable suspicion that contraband was in the vehicle. *Id.* Thus, when the officer placed the defendant and his passenger in the police cruiser, and ceased issuing the traffic citation for following too closely, there was a lack of reasonable suspicion that narcotics trafficking was afoot. *Id.*

Similarly, the facts here do not demonstrate Ziecina had reasonable suspicion that criminal activity was afoot. Ziecina has never testified that he was suspicious of criminal activity based on the information he had before him at the time he returned to the minivan. When Ziecina returned to the minivan, nearly nine minutes had gone by. He therefore had sufficient time to run a check of Warren's and Blakley's licenses and to ascertain whether the minivan had been reported stolen.[3] He had sufficient information to issue the traffic citation, and his decision to prolong the detention by separating the car's occupants for questioning without reasonable suspicion of criminal activity was unreasonable under the circumstances. Ziecina clearly had a "hunch" that narcotics trafficking

---

[3] At oral argument, the Government argued the inevitable discovery rule, however there was no probable cause to arrest the occupants and impound the vehicle for any crime.

was involved, but he did not have articulable facts at that time to warrant an extension of the scope and duration of the stop. Ziecina cannot rely on Blakley's statements made between sixteen and twenty-two minutes during the stop because the stop had already been unjustifiably prolonged at that point. The facts purportedly relied on by Ziecina establishing reasonable suspicion were discovered after the purpose of the original stop had been completed and the stop had been prolonged without reasonable suspicion. Contrary to the Government's argument, the record before this Court does not demonstrate Ziecina had reasonable suspicion of criminal activity, rather Ziecina was on a "fishing expedition" based on his inchoate suspicions.

Additionally, the Sixth Circuit Court of Appeals has adopted a bright-line rule: "When the initial traffic stop has concluded, ... any subsequent prolonging, even *de minimus*, is an unreasonable extension of an otherwise lawful stop." *United States v. Stepp*, 680 F.3d 651, 661-62 (6th Cir. 2012). In *Stepp*, the officer stopped the defendants because a license check had returned showing the license did not match the make of the vehicle. *Id.* at 657. Upon his initial contact with the car, he collected identifications and registrations from the driver and passenger, and went to his vehicle to check licenses. *Id.* at 658. He returned thirteen minutes later, and asked the driver to exit the vehicle and questioned him four minutes while writing the citation. *Id.* After growing suspicious, he decided to question the passenger separately for two minutes and then called for a canine unit, which took an additional three and a half minutes to arrive. *Id.* at 659.

The *Stepp* court held that the extraneous questioning of the passenger and driver and the call for the canine unit unreasonably extended the scope of the stop because there was no evidence that the officers were continuing to investigate the only unresolved issue pending, the license plate mismatch, the reason for the initial stop. *Id.* at 663-64. Here, similarly, Ziecina abandoned the purpose of the initial stop-issuing a traffic citation for improper lane use- roughly nine minutes into

-12-

the stop and the additional fifteen minutes of questioning and the call for the canine unit, which took another four minutes to arrive on the scene, extended the scope and duration of the stop rendering it unreasonable under the Fourth Amendment. The Government's suggestion that Ziecina was diligent in resolving the purpose for the stop is without merit.

## IV.   CONCLUSION

Because Ziecina extended the scope and duration of the stop, he was required to have reasonable suspicion that criminal activity was afoot. As previously discussed, the record before this Court is devoid of the strong indicators of criminal activity that have justified an extension of the scope and duration of a stop based on reasonable suspicion that criminal activity is afoot. As such, Ziecina lacked reasonable suspicion of criminal conduct and could not extend the stop beyond its original purpose without running afoul of the Fourth Amendment. Warren's Motion to Suppress [#29] is GRANTED.

SO ORDERED.

Dated: August 13, 2014                      /s/Gershwin A Drain
                                            GERSHWIN A. DRAIN
                                            UNITED STATES DISTRICT JUDGE

-13-